UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| JASON HALPERN, | Case No. 2:15-CV-2037 JCM (GWF) |
| Plaintiff(s), | ORDER |
| v. | |
| GARY THARALDSON, | |
| Defendant(s). | |

Presently before the court is defendant Gary Tharaldson's motion for summary judgment. (ECF No. 61). Plaintiff Jason Halpern filed a response (ECF No. 66), to which Tharaldson replied (ECF No. 70).

**I.  Facts**

Halpern and Tharaldson were part of a group of investors that invested in the acquisition of a property located in Las Vegas, Nevada, for the purpose of creating a master-planned residential community, which included a golf course. (ECF No. 1 at 12). To purchase the property, the group obtained a $30 million loan, on which Tharaldson provided his personal guaranty. (ECF No. 1 at 12). As a result of the 2007–08 financial crisis, the investors agreed that the property could not be developed further at that time. (ECF No. 1 at 12). However, the existing golf course could not support the payments on the loan, and the loan went into default. (ECF No. 1 at 12).

The loan was subsequently sold to a third party. (ECF No. 1 at 12). After this sale, there were multiple attempts by the investors to try to purchase the loan. (ECF No. 1 at 13–14). While Halpern had nearly closed several attempts to purchase the debt, Tharaldson ultimately acquired the debt in order to extinguish his personal guaranty on the full $30 million. (ECF No. 1 at 14).

**James C. Mahan**
**U.S. District Judge**

Tharaldson entered into a contract ("the contract"), on March 3, 2015, with Halpern and two of the other original investors. (ECF No. 1 at 14). The terms of the contract included that Tharaldson would provide one of the investors with consulting fees and then reimburse Halpern and the other investor for their costs incurred in negotiating their attempted purchase of the loan. (ECF No. 1 at 14).

The contract also included an option for either Halpern or his affiliate to acquire a 50 percent interest in the loan. (ECF No. 1 at 14). To acquire this 50 percent interest, Halpern needed to satisfy three conditions: (1) before the seventy-fifth day following the closing date, Halpern had to provide written notice to Tharaldson of his intention to acquire the interest; (2) Halpern was required to pay Tharaldson 50 percent of the purchase price under the loan purchase agreement together with interest thereon at an annual rate of 8 percent from the closing date through and including the date upon which such payment is made; and (3) Halpern needed to reimburse Tharaldson 50 percent of the reimbursement and the closing expenses. (ECF No. 1 at 14).

If these conditions were met, Halpern and Tharaldson would enter into a joint venture on "commercially reasonable terms." (ECF No. 1 at 15). While not exhaustive, these terms included:

> (i) all decisions and governance with respect to the Loan Purchaser, the Loan, the Property, the budget and the business plan and any all things in connection therewith will require the consent and approval of both [Tharaldson] and [Halpern] (or their respective affiliates), and (ii) a buy/sell provision on commercially reasonable terms in the event [Tharaldson] and [Halpern] are unable to agree on any particular decision, and (iii) pari passu and pro rata capital contributions and returns/distributions to each party.

(ECF No. 1 at 15).

Halpern, through an associate, began conducting negotiations in April and May 2015, to convert the property into the previously-planned residential community. (ECF No. 1 at 15–17). After beginning these negotiations, Halpern alleges that he "made several attempts to exercise his right pursuant to the contract;" however, every time he "expressed his interest" or "tried to exercise his right," "[Tharaldson] and those who work for [Tharaldson] made it abundantly clear that Halpern was not welcome in the partnership." (ECF No. 1 at 17).

Halpern also describes further issues between the two parties that made consummation of the joint venture impossible prior to the seventy-fifth day following the closing date. (ECF No. 1

at 17–18). Despite these issues, both parties claim that they were still amenable to the deal. (ECF No. 1 at 18). They jointly agreed—via a side letter—to extend Halpern's election period under the contract from May 26, 2015, to June 19, 2015. (ECF No. 1 at 18).

Halpern then alleges that Tharaldson refused to cooperate and "would fight Halpern over every term in a joint venture agreement." (ECF No. 1 at 18). As a result of this breakdown, Halpern filed the instant action on July 9, 2015, in the Supreme Court of the State of New York. (ECF No. 1 at 10). The complaint alleges three causes of action: (1) breach of contract; (2) anticipatory breach; and (3) breach of the covenant of good faith and fair dealing. (ECF No. 1 at 18–20).

The suit was then removed to the United States District Court for the Eastern District of New York, and thereafter the suit was transferred to the District of Nevada. (ECF No. 12). On July 18, 2016, the court granted Tharaldson's partial motion to dismiss Halpern's claims for breach of contract and breach of the implied covenant of good faith and fair dealing. (ECF No. 55).

In the instant motion, Tharaldson moves for summary judgment on Halpern's remaining claim for anticipatory breach. (ECF No. 61).

**II.   Legal Standard**

The Federal Rules of Civil Procedure allow summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

For purposes of summary judgment, disputed factual issues should be construed in favor of the non-moving party. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990). However, to be entitled to a denial of summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Id.*

In determining summary judgment, a court applies a burden-shifting analysis. The moving party must first satisfy its initial burden. "When the party moving for summary judgment would

**James C. Mahan**
**U.S. District Judge**

- 3 -

bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

By contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the non-moving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The evidence of the nonmovant is "to be believed, and all

**James C. Mahan**
**U.S. District Judge**

justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted.  *See id.* at 249–50.

### III. Discussion[1]

As an initial matter, New York law applies to the instant dispute.  (*See* ECF No. 55 at 5 ("Because both parties agreed to the application of New York law and New York as a situs satisfies the Nevada multi-factor test, the court will apply New York law to the contract.")).

Under New York law, to state a claim for breach of contract, a plaintiff must show: "(1) formation of a contract between plaintiff and defendant, (2) performance by plaintiff, (3) defendant's failure to perform, [and] (4) resulting damage."  *See, e.g.*, *U.S. Nonwovens Corp. v. Pack Line Corp.*, 4 N.Y.S.3d 868, 871 (N.Y. Sup. Ct. 2015).  Typically, "a contract is not breached until the time set for performance has expired."  *Rachmani Corp. v. 9 E. 96th St. Apt. Corp.*, 629 N.Y.S.2d 382, 384 (N.Y. App. Div. 1995).  However, "a wrongful repudiation of the contract by one party before the time for performance entitles the nonrepudiating party to immediately claim damages for a total breach."  *Am. List Corp. v. U.S. News & World Report, Inc.*, 549 N.E.2d 1161, 1165 (N.Y. 1989) (citations omitted).

Stated differently, "when a party repudiates contractual duties prior to the time designated for performance and before all of the consideration has been fulfilled, the repudiation entitles the nonrepudiating party to claim damages for total breach."  *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 705 N.E.2d 656, 659 (N.Y. 1998) (internal quotation marks and citations omitted).  "A repudiation can be either 'a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach' or 'a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.'"  *Id.* (quoting Restatement [Second] of Contracts § 250; citing II Farnsworth, Contracts § 8.21; UCC 2–610, Comment 1).

---

[1] The court finds the instant motion properly resolved without oral argument.  *See* LR 78-1.

**James C. Mahan**
**U.S. District Judge**

- 5 -

"However, a repudiation can be determined to have occurred only when it is shown that 'the announcement of an intention not to perform was positive and unequivocal.'" *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 112 (2d Cir. 2010) (quoting *Tenavision, Inc. v. Neuman*, 379 N.E.2d 1166, 1168 (N.Y. 1978)). "Mere expression of difficulty in tendering the required performance, for example, is not tantamount to a renunciation of the contract." *Children of Am. (Cortlandt Manor), LLC v. Pike Plaza Assocs., LLC*, 978 N.Y.S.2d 323, 324 (N.Y. App. Div. 2014) (quotation marks and citation omitted).

Halpern's anticipatory breach claim is based on the contract between Halpern and Tharaldson, executed on March 3, 2015, under which Halpern had the option to acquire up to 50 percent interest in the loan provided that on or before June 19, 2015,[2] Halpern satisfied three conditions:

> (1) provide written notice to Tharaldson of his intention to acquire the interest;
> (2) pay Tharaldson 50 percent of the purchase price under the loan purchase agreement together with interest thereon at an annual rate of 8 percent from the closing date through and including the date upon which such payment is made; and
> (3) reimburse Tharaldson 50 percent of the reimbursement and the closing expenses.

(ECF No. 62-5 at 3).

The contract provided that "in the event that [Halpern] acquires such 50% interest, [Tharaldson] and [Halpern] (or their respective affiliates) will enter into a joint venture agreement on commercially reasonable terms that will include" the following:

> (i) all decisions and governance with respect to the Loan Purchaser, the Loan, the Property, the budget and the business plan and any all things in connection therewith will require the consent and approval of both [Tharaldson] and [Halpern] (or their respective affiliates), and (ii) a buy/sell provision on commercially reasonable terms in the event [Tharaldson] and [Halpern] are unable to agree on any particular decision, and (iii) pari passu and pro rata capital contributions and returns/distributions to each party.

(ECF No. 62-5 at 3).

In the instant motion, Tharaldson argues that summary judgment is proper because Halpern cannot establish two essential elements of his anticipatory breach claim: (1) a positive and

---

[2] The original deadline by which Halpern needed to exercise the option under the contract was May 26, 2015—"on or before the 75th day following the Closing Date" (ECF No. 62-5 at 3)—but the parties later agreed in the side letter to extend the deadline to June 19, 2015 (ECF No. 1 at 33).

unequivocal repudiation of the side letter by Tharaldson; and (2) damages beyond mere speculation.  (ECF No. 61 at 17).

As to the first element, Tharaldson contends that Halpern's exercising his option was a condition precedent to the requirement of the parties to enter into a joint venture agreement and negotiate commercially reasonable terms thereunder.  (ECF No. 61 at 10).  In particular, Tharaldson argues that Halpern impermissibly added a condition precedent to his obligation to exercise the option and that Halpern should have exercised his option and paid Tharaldson the $5 million for the loan and reimbursement costs prior to seeking to negotiate the terms of the joint venture agreement.  (ECF No. 61).

In response, Halpern argues that Tharaldson unequivocally and repeatedly "stated that he was unwilling to negotiate the joint venture and forced Halpern to accept his unreasonable and unilaterally-mandated terms, which were contrary to the parties' agreement."  (ECF No. 66 at 6).  In essence, Halpern argues that Tharaldson's refusal to negotiate commercially reasonable terms of the joint venture agreement constitutes Tharaldson's anticipatory repudiation of the contract despite Halpern's failure to acquire the 50 percent interest.  (ECF No. 66).

"[A]n option contract is an enforceable promise not to revoke an offer."  *Saewitz v. Epstein*, 6 F. Supp. 2d 151, 157 (N.D.N.Y. 1998).  "Courts have consistently held that an optionee must exercise his option in order to have rights under the underlying contract."  *Lucente v. Int'l Bus. Machines Corp.*, 146 F. Supp. 2d 298, 312 (S.D.N.Y. 2001).  "An optionee buys a right, and with that right the optionee has the burden 'to make a sufficient tender or offer of performance and to make this to the [optionor] within the time named.'"  *Id.* at 313 (quoting *Bourdieu v. Baker*, 44 P.2d 587, 591 (Cal. Ct. App. 1933)).

"[T]he actual exercise of an option contract by the optionee is the performance of a condition precedent to the optionor's duty to perform."  *Saewitz*, 6 F. Supp. 2d at 157 (citing 4 Arthur L. Corbin, Corbin on Contracts § 264 (1951)).  "'A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.'"  *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*,

404 F.3d 566, 597 (2d Cir. 2005) (quoting *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415 (N.Y. 1995)).

Prior to being exercised, the option contract is a unilateral contract; upon exercise, it becomes a bilateral contract, under which each party is required to perform their obligations. *Saewitz*, 6 F. Supp. 2d at 157. "The doctrine of anticipatory breach is applicable to bilateral contracts which contemplate some future performance by the nonbreaching party." *Am. List Corp.*, 549 N.E.2d at 1164 (citations omitted).

Here, Halpern's anticipatory breach claim is premised on Tharaldson's refusal to negotiate a commercially reasonable joint venture. However, Halpern never purchased the right to enter into a joint venture agreement with commercially reasonable terms. The contract clearly states "in the event that [Halpern] acquires such 50% interest, [Tharaldson] and [Halpern] (or their respective affiliates) will enter into a joint venture agreement on commercially reasonable terms." (ECF No. 62-5 at 3).

It is undisputed that Halpern did not pay and reimburse Tharaldson the amount set forth in the contract so as to acquire a 50 percent interest in the loan. While Halpern has alleged that he notified Tharaldson of his interest in exercising his option on May 14, 2014 (ECF No. 1 at 11), Halpern acknowledges that he did not to satisfy the remaining two conditions. (*See* ECF No. 66 at 13–18 (discussing Halpern's "attempts" to exercise his option and the futility had Halpern exercised his option)). Thus, because Halpern failed to exercise his option so as to acquire a 50 percent interest in the loan, Tharaldson had no duty to enter into a joint venture agreement with Halpern or negotiate terms therefor.

Even if Halpern was not required to exercise his option to assert anticipatory breach, Halpern has not shown that Tharaldson's refusal to "negotiate" a commercially reasonable joint venture ***prior*** to Halpern acquiring a 50 percent interest in the loan constituted a "positive and unequivocal" intention to not enter into a joint venture agreement on commercially reasonable terms "in the event that [Halpern] acquire[d] such 50% interest."

In light of the foregoing, the court will grant Tharaldson's motion for summary judgment as to Halpern's anticipatory breach claim.

**James C. Mahan**
**U.S. District Judge**

**IV. Conclusion**

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED Tharaldson's motion for summary judgment (ECF No. 61) be, and the same hereby is, GRANTED.

The clerk shall enter judgment accordingly and close the case.

DATED March 22, 2017.

                                                                                       UNITED STATES DISTRICT JUDGE